**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **CEPHALON, INC. and**<br>**ACUSPHERE, INC.,**<br><br>Plaintiffs,<br><br>v.<br><br>**CELGENE CORP. and ABRAXIS**<br>**BIOSCIENCE, LLC,**<br><br>Defendants. | Civil Action No.:  1:11-cv-12226-RGS |

**PLAINTIFFS CEPHALON INC.'S AND ACUSPHERE, INC.'S**
**OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................1

II.  THE '493 PATENT ...........................................................................................2

III.  LEGAL STANDARDS .....................................................................................4

    A.  Claim Construction ...............................................................................4

    B.  Indefiniteness .........................................................................................8

IV.  PLAINTIFFS' PROPOSED CONSTRUCTIONS OF THE DISPUTED CLAIM
TERMS SHOULD BE ADOPTED ................................................................10

    A.  "Nanoparticles," "microparticles" and "nanoparticles and microparticles
of a taxane" ...........................................................................................10

        1.  Plaintiffs' proposed constructions of "nanoparticles" and
"microparticles" are supported by the evidence. ......................10

            a.  The patent supports Plaintiffs' constructions................11

            b.  The prosecution history supports Plaintiffs' constructions...........12

            c.  Defendants rely on extrinsic evidence in an attempt to
contradict the intrinsic evidence. ..................................14

        2.  Plaintiffs' construction of "nanoparticles and microparticles of a
taxane" is supported by the evidence........................................15

            a.  The intrinsic evidence supports Plaintiffs' construction and
does not require that the nanoparticles and microparticles
be formed only of a taxane drug. ..................................16

            b.  Defendants' attempt to limit the scope of the claims is
unsupported....................................................................18

    B.  "Hydrophilic excipient"........................................................................19

    C.  "[A porous matrix] formed of a hydrophilic excipient, a wetting agent and
nanoparticles and microparticles of a taxane" ......................................22

    D.  "Wherein the nanoparticles and microparticles have a mean diameter
between about 0.01 and 5 µm and a total surface area greater than about
0.5 m²/mL, wherein the porous matrix is in a dry powder form" and "mean
diameter"...............................................................................................25

        1.  The evidence demonstrates that the particle size and surface area
measurements are made in an aqueous medium using standard
methods known in the art. ..........................................................26

            a.  The intrinsic evidence supports Plaintiffs' construction...............26

2.      A person of ordinary skill in the art would understand "mean diameter" in the '493 patent to refer to volume mean diameter. ...............29

3.      The claim terms incorporating the "mean diameter" term are not indefinite. ...............................................................32

E.      "Wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles" and "matrix dissolves"..........34

1.      "Wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles" ...............34

a.      Plaintiffs' proposed construction of plain and ordinary meaning is supported by the intrinsic evidence. ...........................35

b.      The claim term is sufficiently definite. ..........................................37

2.      "Matrix dissolves" ...................................................................38

F.      "Wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" and "solution" ........................................................................39

1.      The intrinsic evidence supports Plaintiffs' constructions that these terms should be interpreted by reference to Example 3.............................39

2.      The claim term "wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" is sufficiently definite. ............42

V.      CONCLUSION..................................................................................43

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*2-Way Computing, Inc. v. Nextel Fin. Co.*,
    2012 WL 4846145 (D. Nev. Oct. 9, 2012) ...............................................................9

*3M Innovative Props. Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003)...............................................................................41

*Alcon Research Ltd. v. Apotex Inc.*,
    687 F.3d 1362 (Fed. Cir. 2012)...............................................................................23

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
    365 U.S. 336 (1961)...................................................................................................6

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010).................................................................................5

*Athletic Alternatives, Inc. v. Prince Mfg., Inc.*,
    73 F.3d 1573 (Fed. Cir. 1996)...................................................................................6

*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
    359 F.3d 1367 (Fed. Cir. 2004).............................................................................8, 33

*Chicago Mercantile Exchange, Inc. v. Technology Research Group*,
    721 F. Supp. 2d 785 (N.D. Ill. 2010) ................................................................18, 28

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
    418 F.3d 1225 (Fed. Cir. 2005)...............................................................................16

*Computer Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008).................................................................................6

*E.I. DuPont De Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988).................................................................................7

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
    192 F.3d 973 (Fed. Cir. 1999)...................................................................................6

*Eolas Techs., Inc. v. Microsoft Corp.*,
    399 F.3d 1325 (Fed. Cir. 2005).............................................................................6, 19

*Everyscape, Inc. v. Adobe Systems, Inc.*,
    2012 WL 5389735 (D. Mass. 2012) ....................................................................18, 28

*Exxon Research & Eng'g Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001).............................................................................8, 9

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
  607 F.3d 776 (Fed. Cir. 2010)................................................................................9

*Halliburton Energy Servs., Inc. v. M-I LLC*,
  514 F.3d 1244 (Fed. Cir. 2008)..............................................................................9

*Hearing Components, Inc. v. Shure Inc.*,
  600 F.3d 1357 (Fed. Cir. 2010).......................................................................37, 42

*Icon Outdoors, LLC v. Core Resources, Inc.*,
  2012 WL 5521121 (D. Md. Nov. 14, 2012) ..........................................................41

*Individual Network, LLC v. Apple, Inc.*,
  No. 2:07-CV-158, 2009 WL 81795 (E.D. Tex. Jan. 12, 2009)...............................24

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.*,
  887 F.2d 1050 (Fed Cir. 1989).............................................................................7, 9

*Inverness Med. Switz. GmbH v. Warner Lambert Co.*,
  309 F.3d 1373 (Fed. Cir. 2002)..............................................................................6

*Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*,
  554 F.3d 1010 (Fed. Cir. 2009).......................................................................37, 42

*Koninklijke Philips Electronics N.V. v. Zoll Medical Corp.*,
  2012 WL 5932059 (D. Mass. Nov. 26, 2012) .........................................................9

*Kumar v. Ovonic Battery Co.*,
  351 F.3d 1364 (Fed. Cir. 2003).............................................................................31

*LG Electronics U.S.A., Inc. v. Whirlpool Corp.*,
  2011 WL 1560592 (D.N.J. Apr. 25, 2011) .............................................................9

*Markman v. Westview Instruments Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ............................4, 5, 7, 9

*Mars Inc. v. H.J. Heinz Co., L.P.*,
  377 F.3d 1369 (Fed. Cir. 2004).............................................................................16

*McCarty v. Lehigh Valley R.R. Co.*,
  160 U.S. 110 (1895)................................................................................................7

*N. Telecom Ltd. v. Samsung Elec. Co., Ltd.*,
  215 F.3d 1281 (Fed. Cir. 2000)..............................................................................7

*Oakley Inc. v. Sunglass Hut Int'l*,
  316 F.3d 1331 (Fed. Cir. 2003).............................................................................40

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ................................................................. passim

*Powell v. Home Depot*,
 663 F.3d 1221 (Fed. Cir. 2011)...................................................................30

*Power-One, Inc. v. Artesyn Techs., Inc.*,
 599 F.3d 1343 (Fed. Cir. 2010)...................................................................33

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
 438 F.3d 1123 (Fed. Cir. 2006).........................................................6, 19, 25

*Rambus Inc. v. Infineon Techs. AG*,
 318 F.3d 1081 (Fed. Cir. 2003)........................................................7, 23, 36

*Roche Palo Alto LLC v. Lupin Pharms., Inc.*,
 No. 10-3561, 2012 WL 983697 (D.N.J., Mar. 21, 2012) ........................6

*Teva Pharms. USA, Inc. v. Sandoz Inc.*,
 810 F. Supp. 578 (S.D.N.Y. 2011)........................................................41, 42

*Vanderlande Indus. Nederland BV v. I.T.C.*,
 366 F.3d 1311 (Fed. Cir. 2004)...................................................................8

*Versata Software, Inc. v. SAP Am., Inc.*,
 2009 WL 1408520 .................................................................................8, 33

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996)...................................................................5

*Waddington N. Am., Inc. v. Sabert Corp.*,
 No. 09-4883, 2010 WL 4363137 (D.N.J. Oct. 27, 2010) ........................9

*Wellman v. Eastman Chemical Co.*,
 642 F.3d 1355 (Fed. Cir. 2011)................................................. passim

*Young v. Lumenis, Inc.*, 492 F.3d 1336 (Fed. Cir. 2007)..............................39

STATUTES

35 U.S.C. § 112 ¶ 2..........................................................................................9

OTHER AUTHORITIES

Alan Rawle, "Malvern Techical Paper: Basic Principles Of Particle Size Analysis" ..................31

American Heritage Stedman's Medical Dictionary (1995) ..........................21

B. Shekunov et al., "Expert Review: Particle Size Analysis in Pharmaceutics: Principles, Methods and Applications," Pharmaceutical Research, Vol. 24, 203-227 (February 2007) ................................................................................................................................31

E.D. Tex. May 19, 2009 ..................................................................................................................8

F. Carli and A. Motta, "Particle Size and Surface Area Distributions of Pharmaceutical Poweders by Microcomputerized Mercury Porosimetry," Journal Pharmaceutical Sciences, Vol. 73, 197-203 (February 1984) .............................................................31

Harry G. Brittain et al., "Physical Characterization Of Pharmaceutical Solids," Pharmaceutical Research, Vol. 8, 963-973 (1991) ...................................................31

International Union of Pure and Applied Chemistry, "Glossary of Terms Used In Physical Organic Chemistry," Pure & Appl. Chem., Vol. 66, pp. 1077-1184 (1994).............20

Merriam-Webster's Collegiate Dictionary (10th Edition) (1999) ...................................................20

Robert Langer, "Nanoparticulates As Drug Carriers" (ed. Vladimir P. Torchilin 2006) ..............14

The Facts On File Dictionary of Chemistry ...........................................................................21, 20

I.      **INTRODUCTION**

Plaintiffs Cephalon Inc. and Acusphere, Inc. (collectively, "Plaintiffs") brought this patent infringement lawsuit based on Defendants Celgene Corp. and Abraxis Bioscience, LLC's (collectively, "Defendants") infringement of U.S. Patent RE40, 493 ("the '493 patent") (Ex. 1). The '493 patent is directed to pharmaceutical formulations of paclitaxel, a drug known to possess anti-cancer properties.  The inventors of the '493 patent invented a new formulation of paclitaxel that results in increased solubility of the paclitaxel, allowing it to be formulated in a water-based formulation and avoiding the hypersensitivity reactions that were known to occur in patients treated with the previous formulation of paclitaxel.

The claims of the '493 patent are straightforward.  They set forth in clear terms the formulation of the pharmaceutical composition, including smaller sized particles of paclitaxel suspended in a water-based medium that results in a faster dissolution rate.  The precise size of the particles of paclitaxel is specifically defined, as is the qualitatively faster dissolution rate ("increased relative to unprocessed" paclitaxel).

The parties ask the Court to construe 11 claim terms.  Plaintiffs contend that the claim terms are clear on their face, particularly when read in the context of the '493 patent specification and prosecution history.  As explained below, Plaintiffs' constructions are fully supported by the intrinsic record and the plain meaning of terms as used in the art.

Defendants, however, attempt to read limitations into the claims that simply are not there, proposing constructions that contradict the plain language of the claims and feigning inability to know how to read the claims while often paradoxically asserting that they certainly know what the claims *do not* mean.  This is simply a transparent attempt to avoid the plain scope of the claims, as by their own admission in the FDA-approved label for the accused product, Abraxane® falls within the range of particle size claimed in the '493 patent.  Defendants' tactics

are contrary to the bedrock principles of patent law and the well-settled law of claim construction that patent claims are given their ordinary and customary meaning when read in the context of the entire patent, and should be rejected.

When the proper standards for claim construction are applied, it is clear that Plaintiffs' proposed constructions are correct. Plaintiffs therefore request that the Court adopt Plaintiffs' proposed constructions.

## II.     THE '493 PATENT

The '493 patent, entitled "Porous Paclitaxel Matrices And Methods Of Manufacture Thereof," is directed to the formulation of taxanes, a class of drugs known to possess anticancer properties. (Ex. 1, '493 patent at abstr. & col. 1:18-22.) Taxanes are natural products derived from species such as the Pacific yew tree. (*Id.* at col. 1:18-23.) As used in the '493 patent, "'paclitaxel' includes taxanes and derivatives thereof, including paclitaxel and docetaxel." (*Id.* at col. 3:45-47.) Prior to the invention of the '493 patent, while paclitaxel was known to have "tremendous therapeutic potential," there were drawbacks to using the previous formulation of paclitaxel in patients, due to paclitaxel's poor solubility in water. (*Id.* at col. 1:23-26.) This low solubility in water made it difficult to provide paclitaxel in a suitable dosage form. (*Id.* at col. 1:25-27.) In order to be administered to patients effectively, paclitaxel had to be administered with an oil called Cremophor, which in some instances caused severe reactions, including hypersensitivity, in patients. (*Id.* at col. 1:28-36.) As a result, the paclitaxel formulation with Cremophor had to be infused to patients over several hours, and patients needed to be pretreated with steroids and antihistamines prior to the infusion. (*Id.* at col. 1:35-40.)

Scientists at Acusphere, a small, research-based specialty pharmaceutical company, invented a pharmaceutical composition of paclitaxel in an aqueous (water-based) medium that forms a suspension of small particles referred to as "nanoparticles and microparticles" in order to

specifically address the complications associated with the use of Cremophor. (*Id.* at col. 1:66-2:1.) This invention resulted in the '493 patent. In the preferred embodiment of the '493 patent, paclitaxel in an aqueous medium is administered to a patient by injection. (*Id.* at col. 2:47-51.)

The pharmaceutical composition includes a dry porous matrix made of paclitaxel and other pharmaceutical excipients that upon reconstitution with an aqueous medium forms nanoparticles and microparticles of paclitaxel having certain defined characteristics. (*Id.* at col. 2:1-3; col. 3:9-14.) Specifically, the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 micrometers ($\mu$m) and a total surface area greater than about 0.5 m$^2$/mL. (*Id.* at col. 2:3-5.) These characteristics result in increased aqueous solubility and a faster dissolution rate of the paclitaxel relative to unprocessed paclitaxel following administration to the patient (*id.* at col. 3:58-61), allowing the composition to be effectively formulated in an aqueous medium instead of with Cremophor and, therefore, avoiding the associated hypersensitivity reactions in patients needing the medication.

In this litigation, Plaintiffs assert that Defendants' drug product Abraxane®, a formulation of paclitaxel and albumin indicated for the treatment of breast cancer, infringes Claims 1, 4, 5, 17, 18, 19, 23, 27, 29, 45, and 47 of the '493 patent. The asserted independent claims, Claims 1 and 17, read as follows:

Claim 1

A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane,

wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 $\mu$m and a total surface area greater than about 0.5 m$^2$/mL,

wherein the porous matrix is in a dry powder form,

and wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles,

wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane.

Claim 17

A method of treating a patient with a taxane, comprising administering to a patient in need thereof a therapeutically or prophylactically effective amount of a taxane to provide anticancer or antitumor activity

in a formulation comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane,

wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 $m^2$/mL,

and wherein the porous matrix is in a dry powder form, having a TAP density less than or equal to 1.0 g/mL

wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles

wherein the dissolution rate of the taxane nanoparticles and microparticles is increased relative to unprocessed taxane.

All of the remaining asserted claims depend either directly or indirectly from either

Claim 1 or Claim 17.

## III.   LEGAL STANDARDS

### A.   Claim Construction

Claim construction is a question of law.  *See Markman v. Westview Instruments, Inc.*, 52

F.3d 967, 970-71, 977-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).  Courts analyze

claim construction using a hierarchy of evidence.  The claim language, the patent specification,

and the prosecution history constitute the intrinsic evidence.  Of the intrinsic evidence, first, and

most importantly, courts look at the patent claims themselves.  *Phillips v. AWH Corp.*, 415 F.3d

1303, 1312 (Fed. Cir. 2005) (en banc).  Indeed, "[i]t is a 'bedrock principle' of patent law that

'the claims of a patent define the invention to which the patentee is entitled the right to

exclude.'"  *Id.* (citation omitted).  As a result, "the claims are 'of primary importance, in the effort to ascertain precisely what it is that is patented.'"  *Id.*

The patent claim terms generally are given their ordinary and customary meaning, which is the meaning "that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention."  *Id.* at 1312-13.  "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313.  The Federal Circuit has made clear that the specification is critical to claim construction.  *Id.* at 1315.  In fact, "[u]sually, ***it is dispositive***; it is the ***single best guide*** to the meaning of a disputed term."  *Id.* (emphasis added) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).  For example, "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs."  *Id.* at 1316; *accord Markman*, 52 F.3d at 980.  "The specification need not reveal such a definition explicitly."  *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1051 (Fed. Cir. 2010).  "When a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"  *Id.* at 1052 (alteration, citation, and quotations omitted).

The next most important source of intrinsic evidence is the public record of the proceedings by which the patentee obtained the patent from the PTO.  This public record constitutes the prosecution history.  Although the Court should consider the prosecution history as part of the intrinsic evidence, it is less helpful than the claims and the specification: "[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317; *accord Inverness Med. Switz. GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380-82 (Fed. Cir. 2002) (ambiguity of prosecution history made it less relevant to claim construction); *Athletic Alts., Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguity of prosecution history made it "unhelpful as an interpretive resource" for claim construction).

Indeed, there are typically multiple "reading[s] of the history," making it difficult to rely on any one meaning in construing a claim. *See Inverness*, 309 F.3d at 1382. For this reason, the prosecution history cannot be used to limit ("disclaim") the scope of a claim unless the patentee limited "the meaning of a claim term by making a clear and unmistakable disavowal of scope during prosecution." *Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006). For example, "prosecution disclaimer does not apply . . . if the applicant simply describes features of the prior art and does not distinguish the claimed invention based on those features." *Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008); *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1337 (Fed. Cir. 2005) (finding no disclaimer where "the applicants included language about [the alleged disclaimed features] in their response, [but] they did not distinguish the . . . invention based on these features."). Moreover, the Court should consider the prosecution history in totality, rather than relying on cherry-picked statements viewed in isolation. *See*, *e.g.*, *Roche Palo Alto LLC v. Lupin Pharms., Inc.*, No. 10-3561, 2012 WL 983697, at *13 (D.N.J. Mar. 21, 2012) (citing *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999)).

Furthermore, it has long been established that additional limitations – from either the specification or the prosecution history - should not be imported into the claims. *E.g.*, *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961) ("[T]he claims made in the

patent are the sole measure of the grant."); *McCarty v. Lehigh Valley R.R. Co.*, 160 U.S. 110, 116 (1895) ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim, . . . we should never know where to stop."); *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1088 (Fed. Cir. 2003) ("[C]ourts may not read limitations into the claims."); *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1290 (Fed. Cir. 2000) ("This court has repeatedly and clearly held that it will not read unstated limitations into claim language."). The Federal Circuit has consistently held "that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not be read into claims, and that interpreting what is *meant* by a word *in* a claim 'is not to be confused with adding an extraneous limitation appearing in the specification, which is improper.'" *Intervet Am., Inc. v. Kee-Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed Cir. 1989) (citing *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)); *see also Markman*, 52 F.3d at 980 ("Although the prosecution history can and should be used to understand the language used in claims, it . . . cannot 'enlarge, diminish, or vary' the limitations in the claims.") (citation and internal quotation marks omitted). This principle "is, a fortiori, applicable to the impropriety of injecting into claims limitations from the prosecution history." *Intervet*, 887 F.2d at 1053. "No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them." *Id.* (citing *E.I. du Pont*, 849 F.2d at 1433).

The final source of claim construction evidence is referred to as extrinsic evidence, meaning "all evidence external to the patent and prosecution history." *Markman*, 52 F.3d at 980. Extrinsic evidence is less persuasive than intrinsic evidence. Extrinsic evidence, which includes expert and inventor testimony, dictionaries, and learned treatises, should never be used to contradict the context of the specification and claims. *Phillips*, 415 F.3d at 1318, 1324 (citing

*Vitronics*, 90 F.3d at 1583-84).   However, extrinsic evidence "can shed useful light on the relevant art—and thus better allow the court to place itself in the shoes of a person of ordinary skill in the art." *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n*, 366 F.3d 1311, 1318 (Fed. Cir. 2004).

### B.   Indefiniteness

Defendants have asserted that certain claim terms of the '493 patent are indefinite, despite providing a construction for one of the purportedly indefinite terms and lengthy descriptions of what the other purportedly indefinite terms *cannot* mean.[1]  A party alleging that a patent claim is indefinite faces an extremely high hurdle.   A patent is presumed to be definite, and thus "proof of indefiniteness must meet an exacting standard." *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1366 (Fed. Cir. 2011) (internal quotation marks and citation omitted). To show indefiniteness, "an accused infringer must . . . demonstrate by clear and convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art." *Id.* (alteration and quotation omitted).   The Federal Circuit has held that a "claim is not indefinite merely because it poses a difficult issue of claim construction; if the claim is subject to construction, i.e., it is not insolubly ambiguous, it is not invalid for indefiniteness." *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).   Indeed, "if the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds." *Exxon Research*

---

[1]This alone is sufficient to render Defendants' indefiniteness arguments unpersuasive.  *See, e.g.*, *Versata Software, Inc. v. SAP Am., Inc.*, No. 2:07-CV-153, 2009 WL 1408520, at *10 n.3 (E.D. Tex. May 19, 2009) ("A party's proposed construction of a disputed term . . . supports the conclusion that a disputed term is not indefinite.").

*& Eng'g Co. v. United States*, 265 F.3d 1371, 1373 (Fed. Cir. 2001).  Courts in this District have explicitly recognized that when it comes to indefiniteness, "the bar is high" and "even if it is a formidable task to understand a claim, and the result not unanimously accepted, as long as the boundaries of a claim may be understood it is sufficiently clear to avoid invalidity for indefiniteness." *Koninklijke Philips Elecs. N.V. v. Zoll Med. Corp.*, No. 10-11041, 2012 WL 5932059, at *10-11 (D. Mass. Nov. 26, 2012).

In addition, the question of indefiniteness, which Defendants bear the burden to prove by clear and convincing evidence, can be more appropriately decided during later stages of the case. *See, e.g.*, *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010); *Intervet*, 887 F.2d at 1053 ("Ambiguity, undue breadth, vagueness, and triviality are matters which go to claim validity for failure to comply with 35 U.S.C. § 112 ¶ 2, not to interpretation or construction."); *2-Way Computing, Inc. v. Nextel Fin. Co.*, No. 2:11-cv-00012, 2012 WL 4846145, at *19-20 (D. Nev. Oct. 9, 2012); *Waddington N. Am., Inc. v. Sabert Corp.*, No. 09-4883, 2010 WL 4363137, at *3 (D.N.J. Oct. 27, 2010) ("[P]ractical considerations . . . militate against determining indefiniteness prior to the end of fact or expert discovery.").  In deferring the issue of indefiniteness to summary judgment, courts have recognized that "[t]here is a high burden of proof on a party challenging the patent based on indefiniteness, which would be difficult to meet at this early stage." *LG Elecs. U.S.A., Inc. v. Whirlpool Corp.*, No. 09-5142, 2011 WL 1560592, at *6 n.3 (D.N.J. Apr. 25, 2011); *Waddington*, 2010 WL 4363137, at *3; *accord Wellman*, 642 F.3d at 1366 (describing an "exacting standard").  Indeed, "rather than giving meaning to a claim, as a *Markman* hearing is meant to do, indefiniteness invalidates the patent claims entirely." *LG Elecs.*, 2011 WL 1560592, at *6 n.3 (citing *Exxon*, 265 F.3d at 1376).

IV.     **PLAINTIFFS' PROPOSED CONSTRUCTIONS OF THE DISPUTED CLAIM TERMS SHOULD BE ADOPTED**[2]

A.      **"Nanoparticles," "microparticles" and "nanoparticles and microparticles of a taxane"**

The disputed terms are part of all asserted claims.  Claim 1 is representative:

A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and **nanoparticles and microparticles of a taxane**, wherein the **nanoparticles and microparticles** have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form, and wherein upon exposure to an aqueous medium, the matrix dissolves to leave **the taxane nanoparticles and microparticles**, wherein the dissolution rate of **the taxane nanoparticles and microparticles** in an aqueous solution is increased relative to unprocessed taxane.

1.      **Plaintiffs' proposed constructions of "nanoparticles" and "microparticles" are supported by the evidence.**

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "nanoparticles" | Particles of a taxane having a mean diameter between about 0.01 and 5 µm. | Particles that have a diameter of between about 1 to 1000 nanometers (nm), and less than that of microparticles. |
| "microparticles" | Particles of a taxane having a mean diameter between about 0.01 and 5 µm. | Particles that have a diameter of between about 1 to 1000 microns (µm) and greater than that of nanoparticles. |

The intrinsic evidence of the '493 patent makes abundantly clear that "nanoparticles and microparticles of a taxane," together, are deemed to be "particles of a taxane having a mean diameter between about 0.01 and 5 µm." (*E.g.*, Ex. 1, '493 patent, Claim 1.)

---

[2]The parties have agreed to constructions of the following terms:  "Matrix" (all asserted claims):  plain and ordinary meaning, *i.e.*, a material in which something is enclosed or embedded; "Administering to a patient" (claim 17 and dependent claims thereto):  introducing a pharmaceutical product into a patient's body, such as through a parenteral, oral, rectal, pulmonary, mucosal, or topical route; "Wetting agent" (all asserted claims):  "an agent used to facilitate water ingress into the matrix and wetting of the paclitaxel [or other taxane] particles in order to facilitate dissolution."

a.     **The patent supports Plaintiffs' constructions.**

Claim 1 of the patent recites "wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm," without providing a particular diameter range for nanoparticles and another for microparticles.  Claim 6 depends from Claim 1 and specifies a narrower range within the range of Claim 1:  "The composition of claim 1 wherein the mean diameter of *the taxane microparticles* is between about 0.50 and 5 µm."  (*Id.* at cl. 6 (emphasis added).)  To persons of skill in the art, the words nanoparticle and microparticle are terms that generally indicate the size of a particle, although there is no universally agreed upon definition. The claims thus set forth the ranges of diameters, and thereby indicate specifically what size particles are within their scope.

The specification consistently refers to the taxane particles of the invention in the same way.  Whether they are called "nanoparticles and microparticles" or just "microparticles," they are defined as having a specific size.  The specification states:

> Paclitaxel is provided in a porous matrix form which forms *nanoparticles and microparticles of paclitaxel* when the matrix is contacted with an aqueous medium.  The porous matrix with paclitaxel yields upon contact with an aqueous medium *microparticles having a mean diameter between about 0.01 and 5 µm* and a total surface area greater than about 0.5 m$^2$/mL.  (*Id.* at col. 1:66-2:5 (emphasis added).)

There is no other definition provided in the patent.  There is no separate definition of nanoparticle or microparticle.  Thus, the specification does not distinguish nanoparticles from microparticles, rather, the terms "nanoparticles and microparticles" or just "microparticles" are defined globally as particles having a mean diameter in the size range from about 0.01 to 5 µm. (*Id.* at col. 2:1-4; col. 3:15-18.)

Defendants' construction directly contradicts the plain language of the claims. Defendants apply specific ranges for nanoparticles and microparticles based on extrinsic

evidence provided by their expert that contradict the plain language of the claims.  Defendants'

construction of "microparticles" ("particles that have a mean diameter of between about 1 to

1000 microns (µm) and greater than that of nanoparticles") would exclude particles that are

specifically claimed in the patent.  For instance, Claim 6 refers to "the mean diameter of the

taxane microparticles" as being "between about 0.50 and 5 µm."  (*Id.* at cl. 6.)  It is impossible to

have a population of "microparticles" which simultaneously are larger than 1 µm in diameter (as

required by Defendants' construction) and have a mean diameter as low as 0.50 µm (as required

by Claim 6).  The plain language of the claims refutes Defendants' construction.

### b.       The prosecution history supports Plaintiffs' constructions.

The prosecution history of the '493 patent confirms Plaintiffs' constructions.  The term

"nanoparticles" was added to the claims only to "clarify" that the patent claimed particles of a

particular size whether they are called nanoparticles or microparticles.

When Applicants added the word "nanoparticles" to the claims, they made no change in

the specifically articulated size of the particles that are covered by the claims.  Claim 1 of the

Application as originally filed claimed:  "microparticles hav[ing] a mean diameter between about

0.01 and 5 µm and a total surface area greater than about 0.5 $m^2$/mL."  (Ex. 2, U.S. Application

No. 09/798,824 at CEPH-000798.)  Similarly, the specification in the pre-amendment application

stated, "[t]he porous matrix with paclitaxel yields upon contact with an aqueous medium

microparticles having a mean diameter between about 0.01 and 5 µm and a total surface area

greater than about 0.5 $m^2$/mL."  (*Id.* at CEPH-000779.)  And it was this specific size range that

became the basis for distinguishing prior art from the patent applicants' ("Applicants")

invention.  In the first Office Action, the patent examiner ("Examiner") initially rejected the

claims as unpatentable over two prior art references:  U.S. Patent No. 6,096,331 ("Desai") and

U.S. Patent No. 5,855,913 ("Hanes").  (Ex. 3, 12/3/2001 Office Action at CEPH-000879.)  The

Examiner's concern with the Hanes reference was that it taught using "particles the same size as the instant invention (5µm)." (Ex. 4, 6/3/2002 Office Action at CEPH-000916.) The Applicants distinguished Hanes by explaining that "Hanes discloses large diameter (i.e. greater than 5 µm)" particles, while the size range claimed by the '493 patent clearly requires particles with a smaller mean diameter (0.01 and 5 µm). (Ex. 5, 8/7/2002 Amendment at CEPH-000926; *see also* Ex. 6, Hanes at col. 8:24-34 ("The use of larger particles (mean diameter at least about 5 µm) is advantageous (emphasis added).)[3] Applicants thus distinguished the prior art on the basis of the size of the particles. Applicants also added the term "nanoparticles" to some of the claims (*see, e.g.*, Claim 1), but made clear that the addition of the term was merely to "clarify" the invention, not to change the scope of the claims. (Ex. 7, 2/22/2002 Amendment at CEPH-000887, 890, 891.)

The file history therefore shows that the patent defines the nanoparticles and microparticles of the invention as those having a diameter of between about 0.01 and 5 µm. Defendants' constructions ignore this intrinsic evidence the well-settled law that "the specification may reveal a special definition given to a claim term by the patentee." *Phillips*, 415 F.3d at 1316. Instead, Defendants propose their own definitions of "nanoparticle" and "microparticle" and seek to impose them on the patent claims. It is well-settled, however, that in cases like this one, "the inventor's lexicography governs." *Id.*

---

[3]Moreover, there were multiple other points of distinction between Hanes and the claimed invention, which the Applicants pointed out to the Examiner when they were distinguishing the prior art reference (as opposed to clarifying). For example, the Applicants informed the Examiner that: Hanes did not disclose a taxane or paclitaxel as a drug, (Ex. 5, 8/7/2002 Amendment at CEPH-000926 ("The drug is not a taxane.")); and Hanes did not disclose a porous matrix (Ex. 7, 2/22/2002 Amendment at CEPH-000892 ("Nor is there a matrix . . . that dissolves upon contact with water . . . .").) As such, it was entirely unnecessary for the Applicants to distinguish their claimed invention from Hanes on the basis of the one additional word "nanoparticles" and Applicants did not do so.

        c.      **Defendants rely on extrinsic evidence in an attempt to contradict the intrinsic evidence.**

Faced with the plain language of the claims specifying the precise size range of the particles and the confirmation in the file history that those size ranges define the invention, Defendants apparently will resort to extrinsic evidence.  But extrinsic evidence, which as noted above is less persuasive and entitled to less weight than the intrinsic evidence, cannot be used "to contradict the context of the specification and claims."  *Phillips*, 415 F.3d at 1324 (citing *Vitronics*, 90 F.3d at 1583-84).  Defendants' construction seeks to do just that.

In fact, the extrinsic evidence makes even more clear that Defendants' constructions of nanoparticles and microparticles should be rejected.  The extrinsic evidence shows that "the dividing line between nanoparticles and microparticles is ill defined"[4] with varied and overlapping definitions.  Dr. Robert Langer[5], an expert from MIT in pharmaceutical formulations and drug delivery systems (among other areas), noted that the specific definitions of nanoparticles and microparticles vary within the field (Ex. 9, 1/18/13 Langer ¶ 28), and that even scientists working "in the same field sometimes have different definitions of nanoparticles." (Ex. 12, Langer Dep. 20:9-14.)  Definitions adopted by some authorities define nanoparticles as ranging from 1 nm to 100 nm (well smaller than Defendants' proposed range), other authorities (including those relied upon by Plaintiffs' expert Dr. Amiji) define nanoparticles ranging from 1

---

[4] Ex. 8, "Nanoparticulates As Drug Carriers"at 678 (ed. Vladimir P. Torchilin 2006) ("The dividing line between nanoparticles and microparticles is ill defined, with some sources considering 1000 nm particles to be nanoparticles, while the United States patent office has the class definition for nanotechnology using the scale 1-100 nm or slightly larger.").

[5] Dr. Langer submitted three expert reports:  dated January 18, 2013 ("1/18/13 Langer")(Ex. 9), February 22, 2013 ("2/22/13 Langer")(Ex. 10), and April 16, 2013 ("4/16/13 Langer")(Ex. 11). Dr. Langer is a chemical engineer concentrating his research in the areas of pharmaceuticals and biotechnology and is an Institute Professor at the Massachusetts Institute of Technology where he has taught for the last 35 years.  Dr. Langer has lectured extensively and authored or co-authored more than 1200 articles on topics including biomaterials, polymer science, pharmaceutical formulations, drug delivery systems, and biomedical engineering.  Dr. Langer has received over 200 major awards, including the United States National of Science and the Millennium Prize, and it has been announced that it 2013 hewill receive the National Medal of Technology and Innovation.  (Ex. 9, 1/18/13 Langer ¶¶ 3-5.)

nm to 1000 nm, 10 nm to 1000 nm, or 50 nm to 1000 nm.  (Ex. 9, 1/18/13 Langer ¶ 28 n.3; Ex. 10, 2/22/13 Langer ¶¶ 28-30.)   Given the varying definitions of "nanoparticles" and "microparticles," including those provided in Dr. Amiji's own references, Dr. Amiji's assertion that the definitions of a nanoparticle as 1 to 1000 nm and a microparticle as 1 to 1000 microns are "universally accepted" is simply not credible.  (Ex. 13, Amiji Dep. 88:14-20.)

In light of the varying definitions of nanoparticles and microparticles in the literature, it is unsurprising that the inventors acted as their own lexicographers in the '493 patent.   The inventors elected to define "nanoparticles and microparticles" by a specific size range as specifically stated in the claims.  Where inventors define terms in the patent, those definitions govern as a matter of law.  *Phillips*, 415 F.3d at 1316.

> **2.    Plaintiffs' construction of "nanoparticles and microparticles of a taxane" is supported by the evidence.**

Defendants sought to construe the term "nanoparticles and microparticles of a taxane" in addition to the terms "nanoparticles" and "microparticles."   The disputed term is part of all asserted claims.  Claim 1 is representative:

> A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and **nanoparticles and microparticles of a taxane** . . .

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "nanoparticles and microparticles of a taxane" | Particles of a taxane having a mean diameter between about 0.01 and 5 µm. | Nanoparticles and microparticles formed only of a taxane drug.  Controlled release, polymer encapsulated formulations containing paclitaxel and albumin in the form of nanoparticles or microparticles are not nanoparticles or microparticles of taxane as those terms are used in the '493 patent's claims. |

  a. **The intrinsic evidence supports Plaintiffs' construction and does not require that the nanoparticles and microparticles be formed only of a taxane drug.**

  The plain language of the claims states that the composition is comprised of nanoparticles and microparticles of taxane. That is the construction Plaintiffs propose. Defendants' construction would add limitations to the claims: the composition is comprised of "nanoparticles and microparticles ***only*** of a taxane drug" and by imposing negative limitations for which there is no support.

  The claim language does not require that the particles be ***only*** taxane. The claim uses the term "comprising," which has a special meaning in patent law. "Comprising" means that the claimed invention contains all of the elements that subsequently are listed, but in addition can contain other elements. *See, e.g.*, *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (quoting *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1383-84 (Fed. Cir. 2000)) ("A drafter uses the term 'comprising' to mean 'I claim at least what follows and potentially more.'"); *Mars Inc. v. H.J. Heinz Co., L.P.*, 377 F.3d 1369, 1376 (Fed. Cir. 2004) (quoting MPEP § 2111.03 (8th ed. Rev. 1, 2003)) ("[T]he transitional term 'comprising' . . . [is] open-ended and does not exclude additional, unrecited elements or method steps."). The composition includes but is not limited to the taxane particles. Moreover, the claims consistently refer to "the taxane nanoparticles and microparticles" and "the nanoparticles and microparticles of a taxane." They ***do not*** recite "pure taxane" nanoparticles and microparticles or "100% taxane" nanoparticles and microparticles, or nanoparticles and microparticles of "only" a taxane. Defendants' construction requiring purity reads a limitation into the claims that is not there.

  Furthermore, the claim taken as a whole provides informative context. Claim 1 provides that the taxane nanoparticles and microparticles are initially part of a matrix which subsequently "dissolves to leave the taxane nanoparticles and microparticles." (*E.g.*, Ex. 1, '493 patent cl. 1.)

According to the claims, the matrix includes a hydrophilic excipient and a wetting agent as well as the taxane particles. (*Id.*) The specification confirms that the matrix consists of more than just taxane, stating that the matrix is made up of "at least 1 to 95% taxane by weight" and "also may contain hydrophilic excipients such as water soluble polymers and sugars, wetting agents such as surfactants, and tonicity agents." (*Id.* at col. 3:9-11.) The specification even provides examples of "wetting agents" which are not water soluble, including magnesium aluminum sulfate. (*Id.* at col. 4:61; Ex. 13, Amiji Dep. 54:10-12.) The specification states that "[u]pon contact with an aqueous medium, water penetrates through the highly porous matrix to dissolve *the water soluble excipients* in the matrix." (Ex. 1, '493 patent, col. 3:54-57.) Thus, the patent establishes that there may be excipients in the matrix that do not dissolve and that, therefore, would be present when the microparticles and nanoparticles of taxane are constituted. As such, one skilled in the art would know that the microparticles and nanoparticles of a taxane that remain when the matrix dissolves would not only be comprised of the drug, but would include other components, like excipients, associated with them as well.

Second, the specification uses chemical or drug names, like "taxane" or "paclitaxel," to refer to the primary component of a substance, and not to a 100% pure substance. For example, the specification refers to "the paclitaxel solution" and the "paclitaxel solvent," (*id.* at col. 2:9, 22-23, 29), which includes both paclitaxel and a volatile solvent (*id.* at col. 2:8-9; col. 7:40-43), and is not 100% pure paclitaxel. Similarly, the patent characterizes the matrix – which is at most only 95% paclitaxel by weight - as a "porous matrix of paclitaxel" or "paclitaxel matrix." (*Id.* at page 1 (Abstract), col. 2:13; col. 3:8, 9, 24, col. 7:26-27, col. 10:60.) In fact, Dr. Amiji admitted that "paclitaxel matrix" referred to "all of [the] components" of the matrix, including the hydrophilic excipient and the wetting agent. (Ex. 13, Amiji Dep. 83:8-16.) Therefore, the

patent, when it refers to particles of taxane is not referring to a 100% pure taxane, but to a particle that includes taxane.

In addition, nothing in the file history indicates that the nanoparticles and microparticles must only be taxane.  In the consistently provided description of the invention, there is no purification step required or discussed after dissolution of the matrix.  In fact, the method and equipment used to measure the particles disclosed in the patent and file history is incapable of distinguishing between particles of pure taxane and particles associated with other components of the paclitaxel matrix.  Defendants' expert Dr. Amiji admitted that a Coulter Counter, the method used for measuring particle size disclosed in the provisional application[6] cannot distinguish taxane (or paclitaxel) from other materials associated with it.  (Ex. 13, Amiji Dep. 50:23-51:11.)  If there is no purification step described and the method for measuring particle size and surface area contemplated by the intrinsic evidence cannot distinguish between taxane and other components, it cannot be a requirement of the invention that the particles consist *only* of pure taxane.  The intrinsic evidence therefore does not contemplate that the result of the dissolution of the matrix will be 100% pure taxane.

> **b.**     **Defendants' attempt to limit the scope of the claims is unsupported.**

Defendants further attempt to limit the claims by arguing for certain negative constructions, in this instance contending that the claims cannot encompass "[c]ontrolled release, polymer encapsulated formulations containing paclitaxel and albumin in the form of nanoparticles or microparticles."  Again, Defendants attempt to add limitations to the claim that

---

[6] The '493 patent derives from United States Provisional Application No. 60/158,659 ("the '659 provisional application") (Ex. 14 at CEPH-000704, 722), and as such, the '659 provisional application is part of the intrinsic record of the '493 patent.  *E.g.*, *EveryScape, Inc. v. Adobe Sys., Inc.*, No. 10-11597, 2012 WL 5389735 at *4-5 (D. Mass. Nov. 5, 2012); *Chi. Mercantile Exch., Inc. v. Tech. Research Grp., LLC*, 721 F. Supp. 2d 785, 793-94, 800 (N.D. Ill. 2010).

simply are not there.   Defendants' argument is based on a misunderstanding of the law of disclaimer and a mischaracterization of the prosecution history.

The prosecution history can only be used to limit the scope of a claim if the patentee made "a clear and unmistakable disavowal of scope during prosecution."  *Purdue Pharma*, 438 F.3d at 1136.   Applicants never clearly and unmistakably disavowed the inclusion of "controlled release, polymer encapsulated formulations containing paclitaxel and albumin" within the scope of the claims.   Defendants apparently rely on statements concerning a piece of prior art known as the Desai patent.   But during the prosecution, Applicants merely described Desai as disclosing *inter alia* "controlled release, polymer encapsulated formulations," but did not disclaim such formulations.   (Ex. 7, 2/22/2002 Amendment at CEPH-000892.)   In fact, when the Applicants explained why their invention was different than Desai, they did not say that controlled release, polymer encapsulated formulations containing paclitaxel and albumin were not part of their invention.   Instead, Applicants amended their claims to "incorporate the limitation that the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to" unprocessed taxane and argued that "[n]one of the art teaches making a taxane with a faster dissolution rate."   (Ex. 5, 8/7/2002 Amendment at CEPH-000924, 926.)   Applicants' *description* of various other features of the Desai prior art does not operate as a disclaimer of those features.   *See Eolas Techs.*, 399 F.3d at 1337 (finding that prosecution disclaimer did not apply because the applicant simply described features of the prior art without distinguishing the claimed invention based on those features).   Defendants' attempt to read negative limitations into the claims should therefore be rejected.

B.      **"Hydrophilic excipient"**

The disputed claim term "hydrophilic excipient" appears in all asserted claims.   Claim 1 is representative:

A pharmaceutical composition comprising a porous matrix formed of a **hydrophilic excipient**, a wetting agent and nanoparticles and microparticles of a taxane . . .

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "hydrophilic excipient" | Plain and ordinary meaning, *i.e.*, an inert substance in a drug vehicle having an affinity for water. | An inert component of a pharmaceutical product that will dissolve upon contact with an aqueous medium. |

A person of ordinary skill in the art would understand that the term "hydrophilic excipient" is used in the '493 patent according to its plain and ordinary meaning, which is an inert substance in a drug vehicle having an affinity for water. Defendants do not appear to dispute that "excipient" refers to an inert substance in a drug vehicle. The only dispute appears to concern the meaning of "hydrophilic." Plaintiffs apply the well-established plain meaning of the term; Defendants use the construction as another opportunity to add to the claims limitations.

"Hydrophilic" has a well-established meaning to persons of skill in the art. Definitions in standard dictionaries support Plaintiffs' construction. *E.g.*, Ex. 16, Merriam-Webster's Collegiate Dictionary (10th Edition) (1999) ("Hydrophilic: of, relating to, or having a strong affinity for water . . . ." ( CEPH-001884)); Ex. 17, The Facts On File Dictionary of Chemistry ("Hydrophilic: Water attracting." (CEPH-001857)).) The International Union of Pure and Applied Chemistry (IUPAC) defines hydrophilic as "water loving."[7] Plaintiffs' expert Dr. Langer further confirmed that a person of ordinary skill in the art would understand that the term "hydrophilic" is an adjective with the plain and ordinary meaning of "having an affinity for water."[8] (Ex. 9, 1/18/13 Langer ¶ 23; Ex. 10, 2/22/13 Langer ¶ 19.) Even the definition in a

---

[7]Ex. 18, International Union of Pure and Applied Chemistry, "Glossary of Terms Used In Physical Organic Chemistry," Pure & Appl. Chem., Vol. 66, pp. 1077-1184, at 1123 (1994) (CEPH-001782.)

[8]It does not appear that the parties substantively dispute the meaning of the term "excipient." Dr. Langer testified that the term is a noun with a plain and ordinary meaning of "an inert substance in a drug vehicle." (Ex. 9, 1/18/13 Langer ¶ 24.)

dictionary relied upon by Defendants' expert supports Plaintiffs' construction:  The American Heritage Stedman's Medical Dictionary (1995) ("Stedman's") defines "hydrophilic" as "having an affinity for water; readily absorbing or dissolving in water."  (Ex. 15, Stedman's (Amiji App. C-2) at ABRX-001238.)

These definitions highlight the fact that some but not all hydrophilic excipients dissolve in an aqueous medium.  Specifically, the definitions cited by both parties define hydrophilic excipients as substances that may dissolve in water, but also include those that absorb water, attract water, or have an affinity for water.  (*See e.g.*, Ex. 15, Stedman's at ABRX-001238; Ex. 17, The Facts On File Dictionary of Chemistry at CEPH-001857.)  No dictionary or treatise cited by either party provides support for limiting the definition to substances that dissolve in aqueous media, let alone an even more limited subset of chemicals that completely and immediately dissolve in water.  (Ex. 19, 1/17/2013 Amiji ¶¶ 54, 55.)

The specification supports Plaintiffs' construction.  The specification confirms that not every excipient, but instead *only* water soluble excipients will dissolve:  "[u]pon contact with an aqueous medium, water penetrates through the highly porous matrix to dissolve the water soluble excipients in the matrix."  (Ex. 1, '493 patent at col. 3:54-57.)  The specification provides that the "matrices also may contain hydrophilic excipients such as water soluble polymers or sugars, which can serve as bulking agents or wetting agents."  (Ex. 1, '493 patent at col. 3:51-53.)  Thus, while "hydrophilic" includes excipients that dissolve, they are not limited to such excipients. The specification further states that the hydrophilic polymers that can be used in the paclitaxel matrices "include both synthetic and natural polymers," and lists albumin as a representative example of a natural polymer.  (*Id.* at col. 4:9-12, 17.)  According to Defendants' expert Dr. Amiji, wetting agents are hydrophilic excipients, (Ex. 20, 2/21/2013 Amiji ¶ 21), and not all of

the wetting agents listed in the '493 patent (e.g., magnesium aluminum silicate) dissolve in water.  (*Id.* at col. 4:61; Ex. 13, Amiji Dep. 54:10-12.)  The patent never states that hydrophilic excipients are only those substances that dissolve upon contact with an aqueous medium.

As such, Defendants' attempt to read into the claims a requirement that the excipient dissolve on contact with an aqueous medium is wholly unsupported.  There is nothing in the claims or the specification that requires that all hydrophilic excipients dissolve, much less that they dissolve immediately and completely, when they come in contact with an aqueous medium. The patent does not require that every type of excipient dissolves and requiring that they do clearly goes beyond the intrinsic evidence of the '493.

**C.    "[A porous matrix] formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane"**

The disputed claim term appears in all asserted claims.  Claim 1 is representative:

A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane . . .

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "[A porous matrix] formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane" | Plain and ordinary meaning, *i.e.* that the porous matrix is formed of at least three components (which do not need to be distinct from each other) including (1) a hydrophilic excipient; (2) a wetting agent; and (3) nanoparticles and microparticles of a taxane. | A surrounding material within which something else originates, develops, or is contained formed of four different components: (i) a hydrophilic excipient, (ii) a wetting agent, (iii) nanoparticles of a taxane, and (iv) microparticles of a taxane, and within which pores are dispersed throughout. |

The critical difference between the parties' proposed constructions is that Defendants' construction requires that the porous matrix consist of "four different" components while Plaintiffs' proposed construction allows the porous matrix to be formed of components that serve three purposes (hydrophilicity, wetting, and the active ingredient taxane) but does not require

that there be three distinct components.  Nothing in the patent requires that the components that serve the prescribed purposes be different from one another and thus Defendants improperly seek to import additional limitations into the claims.  *E.g.*, *Rambus*, 318 F.3d at 1088.

Looking first at the claims, which "are 'of primary importance, in the effort to ascertain precisely what it is that is patented,'"  *Phillips*, 415 F.3d at 1312, it is clear that the plain language requires simply that the matrix include a hydrophilic excipient, a wetting agent and particles of taxane. As long as the matrix contains each, the elements of the claim are present. For instance, if the matrix contains a substance that is both a hydrophilic excipient and a wetting agent and in addition contains the required particles of taxane, the drug is covered by the claim.

Other claims of the patent make clear that this is the correct construction.  Dependent Claim 45 (which depends from Claim 1) and Claim 47 (which depends from claim 17), explicitly *require* that "the hydrophilic excipient is the wetting agent."  (Ex. 1, '493 patent at cls. 45, 47.) Therefore, a hydrophilic excipient that also serves as the wetting agent is expressly within the scope of Claims 45 and 47.  Because "it is axiomatic that a dependent claim cannot be broader than the claim from which it depends," *e.g.*, *Alcon Research, Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012), independent Claims 1 and 17 (from which Claims 45 and 47 depend) allow the hydrophilic excipient and wetting agent to be the same substance.  Indeed, in allowing Claims 45 and 47, the Examiner explicitly confirmed this understanding by stating that the new claims (at the time 49 and 51) "are within the scope of claims previously allowed [1 and 17]." (Ex. 21, 8/17/2007 Supp. Not. Allow. at CEPH-001539.)  Defendants' construction requiring the opposite conclusion, that Claims 45 and 47 are not within the scope of Claims 1 and 17, directly contravenes the law and the conclusion of the Examiner.

The specification of the '493 patent also confirms that the hydrophilic excipient and wetting agent are not required to be distinct substances.   The specification states that the "hydrophilic excipients, such as water soluble polymers or sugars . . . can serve . . . as wetting agents."  (Ex. 1, '493 patent at col. 3:51-54.)  The specification further instructs that excipients such as a "hydrophilic polymer" may perform the function of a wetting agent:  "excipients can function as bulking agents, release-modifiers, wetting agents, tonicity agents, or **combinations thereof**."   (*Id.* at col. 3:66-4:1 (emphasis added); *see also* col. 4:28-30.) The specification particularly identifies hydrophilic excipients, like albumin, that can be used as a wetting agent. (*Id.* at col. 4:17; col. 4:28-30, col. 4:45-49; Ex. 12, Langer Dep. 281:8-14.)

Finally, Applicants did not, as Defendants appear to suggest, disclaim hydrophilic excipients and wetting agents were the same substance.   There is no clear and unmistakable disavowal of claims that include substances that are both hydrophilic excipients and wetting agents.  To the extent that Defendants argue, as it appears they will, that Applicants defined their invention as having separate substances that served as hydrophilic excipients and wetting agents in distinguishing the Hanes prior art reference, they are wrong.   At the time that the Applicants added the term "hydrophilic excipient" to the claims, they made absolutely no remarks that contradicted the specification's statements that hydrophilic excipients and wetting agents to do not need to be distinct.  (Ex. 7, 2/22/2002 Amendment at CEPH-000887, 890, 891-92.0.)  *See Individual Network, LLC v. Apple, Inc.*, No. 2:07-CV-158, 2009 WL 81795, at *4 (E.D. Tex. Jan. 12, 2009) (citing, *e.g.*, *Phillips*, 415 F.3d at 1317) ("[A]mbiguous prosecution history cannot be used to trump the clear terms of the claims and specification.".)  It was not necessary for the Applicants to add the term "hydrophilic excipient" in order to distinguish their invention from Hanes.  As described above, there were multiple points of distinction between Hanes and the

claimed invention.  (*See* FN3, *supra*.)  The Examiner did not distinguish Hanes based on the

invention having separate substances that served as hydrophilic excipients and wetting agents.  In

allowing the claims, the Examiner found that the limitation that "the dissolution rate of the

taxane nanoparticles and microparticles in an aqueous solution is increased relative to

unprocessed taxane" was "sufficient to overcome the teachings of the prior art."  (Ex. 22,

11/26/2002 Not. Allow. at CEPH-000954.)  Thus, nothing in the prosecution history contradicts

the clear language of the claims and specification, much less rises to the level of "a clear and

unmistakable disavowal of scope during prosecution."  *Purdue Pharma*, 438 F.3d at 1136.

**D.**      **"Wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form" and "mean diameter"**

The disputed terms are part of all asserted claims.  Claim 1 is representative:

A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane, **wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL** . . . .

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "Wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form" | Plain and ordinary meaning, *i.e.*, as measured by standard techniques, the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL after the porous matrix dissolves upon contact with an aqueous medium | This claim limitation is indefinite.  To the extent that this limitation can be construed, it should be construed as:  wherein the nanoparticles and microparticles of a taxane in the porous matrix, when the porous matrix is in a dry powder form, have a mean diameter between about 0.01 and 5 µm and the sum of their internal and external surface areas must be greater than about 0.5 m$^2$/mL of nanoparticles and microparticles. Any construction should make clear that this limitation refers to |

25

| | | the mean diameter and total surface area of particles of drug (taxane or paclitaxel) only, not including the diameters or surface areas of any other components forming the porous matrix. |
|---|---|---|
| "Mean diameter" | Volume mean diameter | The term is indefinite |

1.  **The evidence demonstrates that the particle size and surface area measurements are made in an aqueous medium using standard methods known in the art.**

a.  **The intrinsic evidence supports Plaintiffs' construction.**

Plaintiffs' construction reflects the plain and ordinary meaning of the claim term, which is clear on its face. In response, Defendants make two contradictory arguments. First, they argue that the claims are too indefinite to be construed. Second, they provide a lengthy construction that adds numerous limitations well beyond the plain language of the claims.

There is nothing indefinite about the patent claims. It explicitly sets forth the size of the "nanoparticles and microparticles" and their surface area. (Ex. 1, '493 patent at cls. 1, 17.) The "nanoparticles and microparticles" must have "a mean diameter between about 0.01 and 5 μm and a total surface area greater than about 0.5 m$^2$/mL" in order to satisfy the claims. (*Id.*) There can be no dispute that the claims clearly define the mean diameter and the surface area that the nanoparticles and microparticles must possess.

The patent also makes clear that standard techniques known in the art can be used to make the measurements. The patent specifically directs a person of ordinary skill in the art to use "standard particle sizing equipment and techniques." (Ex. 1, '493 patent at col. 3:21-23.) While the specification does not spell out any particular equipment required to measure mean diameter and total surface area, "an inventor need not explain every detail because a patent is read by those of skill in the art." *Wellman*, 642 F.3d at 1367. "Well known industry standards

need not be repeated in a patent." *Id.* A person of ordinary skill in the art knows how to measure particle size or mean diameter and "there are certain standard techniques to do that." (Ex. 12, Langer Dep. at 206:5-9.) Indeed, "mean diameter" is frequently referred to in the patent literature without reference to the particular methods used to measure it, including in the patent applications of Defendant's expert Dr. Amiji. (Ex. 11, Langer Supp. Decl. ¶ 8.) Indeed, in Dr. Amiji's patents, he affirmatively states that the "average [or mean] diameter of the nanoparticles can be measured by any method known in the art." (Ex. 23, WO 2011/119822 ("Amiji") ¶ 32 at CEPH-002122.) There are in fact several methods for measuring mean diameter known in the art, including the Coulter Counter and light scattering methods. (Ex. 12, Langer Dep. at 195:20-196:9; Ex. 13, Amiji Dep. at 51:16-52:15.) A person of ordinary skill in the art would have no difficulty measuring particle size and total surface area by standard techniques and calculating a mean diameter. (*See* Ex. 1, '493 patent at col. 3:21-23.)

Moreover, the '493 patent makes clear that the measurement of particle size and surface area must be made after contact with an aqueous medium, contrary to Defendants' contention that it should be measured dry. The claim language itself states that "upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles," after which the taxane particles have the required measurements. (*Id.*) The specification provides further clarity that the time for measurement of the particles is after contact with the aqueous medium: "The porous matrix with paclitaxel *yields upon contact with an aqueous medium* microparticles having a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 $m^2$/mL." (*Id.* at col. 2:1-5; col. 3:15-21 (emphasis added).) The nanoparticles and microparticles of paclitaxel remain in suspension after the matrix dissolves. (*Id.* at col. 3:54-58.) The matrix dissolves only after exposure to an aqueous medium. The

relevant time for measurement *therefore* occurs only after the matrix dissolves and nanoparticles and microparticles are left in suspension in the aqueous medium. A person of skill would understand that the particle size and surface area measurements are made after reconstitution of the dry porous matrix in an aqueous medium.

The unit of measurement used to describe the surface area of the nanoparticles and microparticles further demonstrates that the measurement is made after contact with the aqueous medium. In the patent claims, the surface area is measured in $m^2/mL$ units. (*Id.* at cls. 1, 17.) The specification uses those same units ($m^2/mL$) when explicitly referring to measurements made after contact with the aqueous medium. (*Id.* at col. 2:1-5.) By contrast, when the specification describes the measurement of a dry substance, the dry porous matrix, using a technique called BET surface area analysis, the measurements are reported in units of $m^2/g$. (*Id.* at col. 3:36-43.) Thus, the use of the units $m^2/mL$ in the claims further confirms that the measurements are taken following contact with an aqueous medium.

The prosecution history of the '493 patent also demonstrates unequivocally that the measurement is to be completed after exposure of the matrix to the aqueous medium. The '493 patent derives from United States Provisional Application No. 60/158,659 ("the '659 provisional application"), and as such, the '659 provisional application is part of the intrinsic record of the '493 patent. *E.g.*, *EveryScape, Inc. v. Adobe Sys., Inc.*, No. 10-11597, 2012 WL 5389735 at *4-5 (D. Mass. Nov. 5, 2012); *Chi. Mercantile Exch., Inc. v. Tech. Research Grp.*, 721 F. Supp. 2d 785, 793-94, 800 (N.D. Ill. 2010). The '659 provisional application specifically states:

> The average total surface area of the microparticles produced *following contact of the porous matrix*, which typically is in the form of a dry powder, *with water* preferably is greater than about 0.9 $m^2/mL$. Total surface area values can be provided using standard Coulter Counter equipment and techniques. (Ex. 14, '659 provisional application at CEPH-000704 (emphasis added).)

The mean particle size and surface area of the drug particles [is] generated when the powder . . . is reconstituted in aqueous media . . . . (*Id.* at CEPH-000722.)

The equipment used in the priority application also confirms that the measurement is done following contact of the porous matrix with an aqueous medium.  The '659 provisional application provides that the measurements may be made using "standard Coulter Counter equipment and techniques."  (*Id.*; Ex. 12, Langer Dep. 226:22-227:18.)  A Coulter Counter is a device which measures particle size based on the electrical conductance of particles suspended in fluid passed through an aperture, and it is known by persons of ordinary skill in the art that a Coulter Counter cannot measure dry powders.  Rather, dry powders must be suspended in a liquid medium in order to be measured by the Coulter Counter.  (Ex. 13, Amiji Dep. 50:6-7; 227:22-228:2.)

The claims and the intrinsic evidence thus clearly provide that the particles should have "a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form."  That measurement should be done using standard equipment and techniques that are well known to the person of skill in the art and the measurements should be made after contacting the matrix with an aqueous medium.  In the context of the '493 patent, the plain and ordinary meaning is that as measured by standard techniques, the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL after the porous matrix dissolves upon contact with an aqueous medium.

      **2.**      **A person of ordinary skill in the art would understand "mean diameter" in the '493 patent to refer to volume mean diameter.**

At his deposition, Dr. Amiji appeared to suggest for the first time that the type of "mean diameter" referenced in the patent is unclear.  The intrinsic and extrinsic evidence demonstrates that the mean diameter as referenced in the '493 patent refers to volume mean diameter.

The prosecution history of the '493 patent confirms that both the Applicants and Examiner understood the mean diameter of the claims to be calculated by a volume mean diameter. When the Examiner issued an initial rejection of the claims based in part on the Hanes reference, the particle size in the patent application and in the Hanes prior art reference was directly at issue. The Examiner asserted that Hanes "teaches that particles can be from 5µm-30µm" and that "Hanes does teach using particles the same size as the instant invention (5 µm)." (Ex. 4, 6/3/2002 Office Action at CEPH-000915-916.) The Applicants responded by distinguishing Hanes as disclosing "large diameter (i.e., greater than 5 µm)" particles. (Ex. 5, 8/7/2002 Amendment at CEPH-000926.) In short, the Examiner and the Applicants were able to understand Applicants' claims concerning mean diameter and the Examiner did not question the Applicants' assertion on that basis.

Further, the exchange between the Applicants and the Examiner in the prosecution history makes clear that the Examiner and the Applicants were referring to "mass [same as volume[9]] mean diameter" measurements of the particles. The Hanes patent stated that "[t]he mass mean diameter of the particles can be measured using a Coulter Multisizer II," the very same equipment referenced in the priority application for the '493 patent. (Ex. 6, Hanes at col. 7:54-56.; col. 14:7-9; at abstr.) Thus, in the file history, the Examiner knew that the Hanes reference used the volume mean diameter and compared that to the mean diameter claims of the patent application as determined by the same technique. The intrinsic record establishes that the "mean diameter" was understood as a volume mean diameter by standard techniques for measuring particle size in an aqueous medium, such as a Coulter Counter. *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011) ("[P]rior art . . . cited in the prosecution

---

[9]Defendants' Expert Mansoor Amiji admits that the mass mean diameter is the same as volume mean diameter. (4/22/2013 Amiji Supplemental Decl. ¶ 9.)

history of the patent constitutes intrinsic evidence."); *Kumar v. Ovonic Battery Co. Inc.*, 351 F.3d 1364, 1367-68 (Fed. Cir. 2003) (finding prior art that was "extensively discussed and distinguished during prosecution" persuasive in construing a claim term because it "was considered by both the applicant and the examiner to be highly pertinent prior art").

While it is not necessary to consult the extrinsic evidence to come to this conclusion, the extrinsic evidence supports the conclusion that the volume mean diameter is what a person of ordinary skill in the art would understand mean diameter to mean, absent direction to the contrary. Dr. Langer, upon a thorough review of the literature and supported by a number of references, opines that "a person of ordinary skill in the art would understand the volume mean diameter to define the mean diameter in the claims of the '493 patent." (Ex. 11, 4/16/2013 Supp. Langer Decl. ¶ 7 (citing *e.g.,* Ex. 25, Alan Rawle, "Malvern Techical Paper: Basic Principles Of Particle Size Analysis" at CEPH-002155 ("Laser diffraction initially calculates a distribution based around volume terms and this is why the D[4,3] [volume mean diameter] is reported in a prominent manner."); Ex. 26, Carli (1984)[10] at CEPH-002600 ("the volume or mass distribution[11] is considered the most informative data for particle sizes of pharmaceutical powders."); Ex. 27, Brittain (1991)[12] at CEPH-002632 ("The data are normally displayed as a volume distribution . . . ."); Ex. 28, Shekunov (2007)[13] at CEPH-002611, 2617 ("As a rule, the

---

[10]Ex. 26, F. Carli and A. Motta, "Particle Size and Surface Area Distributions of Pharmaceutical Poweders by Microcomputerized Mercury Porosimetry," Journal Pharmaceutical Sciences, Vol. 73, 197-203, at 202 (February 1984)

[11]A volume distribution is naturally used to calculate a volume mean. *See e.g.,* Ex. 24, 4/22/2013 Amiji Supp. Decl. ¶ 28 (Asserting that for another kind of size distribution, intensity distribution, "can be used to calculate an intensity mean diameter.")

[12]Ex. 27, Harry G. Brittain et al., "Physical Characterization Of Pharmaceutical Solids," Pharmaceutical Research, Vol. 8, 963-973, At 968 (1991)

[13]B. Shekunov et al., "Expert Review: Particle Size Analysis in Pharmaceutics: Principles, Methods and Applications," Pharmaceutical Research, Vol. 24, at 203-227 (February 2007)

volume (mass)-weighted PSD is the most appropriate description for pharmaceutical materials."); Ex. 29, Malvern Mastersizer Manual (1997) at CEPH-002508 ("fundamental size distribution derived by this technique is volume based."); Ex. 30, U.S. Patent No. 5,955,108 (Issued 9/21/1999) (Reporting all distributions "on a volume or mass basis[.]"))

The Court should adopt Plaintiffs' proposed construction that a person of ordinary skill in the art would understand the "mean diameter" in the '493 patent claims to be a "volume mean diameter."

### 3.   The claim terms incorporating the "mean diameter" term are not indefinite.

Despite Defendants initially providing a construction for the term "wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form,"[14] they now contend the term, including the term "mean diameter," is indefinite.  In light of the intrinsic record discussed above, Defendants' indefiniteness argument cannot succeed.

As noted above, a party alleging that a patent is indefinite faces an extremely high hurdle. A patent is presumed to be definite, and thus "[p]roof of indefiniteness must meet and 'exacting standard.'"  *Wellman*, 642 F.3d at 1366.  To show indefiniteness, "an accused infringer must demonstrate by clear and convincing evidence that one of skill in the relevant art could not discern the boundaries of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art."  *Id.* (alteration and quotation omitted).  The question is not whether it is possible to dispute the meaning of the claims.  The

---

[14]The term "mean diameter" was identified as a separate term for construction after the service of expert reports regarding claim construction and after depositions of the parties' respective experts.

question is whether the claims are so indefinite that they cannot even be construed.  Defendants cannot meet that standard.

First, as demonstrated above, not only can the claim terms be construed, but the proper construction is clearly evidenced by the intrinsic evidence and supported by the extrinsic evidence.

Second, there is nothing about the claims that makes them "insolubly ambiguous." *Bancorp*, 359 F.3d at 1371.  To the contrary, the claims are straightforward.  They call for a pharmaceutical composition that contains among other things particles of taxane that have a particular, well-defined diameter and surface area.  Scientists routinely measure the diameter and surface area of particles.  (Ex. 1, '493 patent at col. 3:22-23 (instructing scientists to use "standard particle sizing equipment and techniques.")  Scientists routinely report those results without specifying the type of mean diameter calculation that had been done.  (*See e.g.*, Ex. 11, 4/16/2013 Langer ¶ 8.)  In fact, Defendants report the mean diameter of the particles in their accused product[15] without specifying the method used.  (Ex. 31, Abraxane Label at CEPH-000154 ("Abraxane . . . is an albumin-bound form of paclitaxel with a mean particle size of approximately 130 nanometers.")  Patents routinely are granted with claims similar to those in the '493 patent.  (*See e.g.*, Ex. 11, 4/16/2013 Langer ¶ 8.)  Persons of skill in the art, including the Examiner, understand the claim terms and do not find them to be incapable of construction.

Paradoxically, Defendants continue to put forth a lengthy construction for the claim term.  But Defendants cannot have it both ways:  either the claim terms are "insolubly ambiguous" and "not amenable to construction," *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010), or they are not.  *See Versata*, 2009 WL 1408520, at *10 n.3.

---

[15] The particles as measured by Defendants are within the scope of the claims of the patent.

The claim term can and should be construed consistent with Plaintiffs' proposed construction. Defendants' indefiniteness argument should be rejected.

>    **E.**    **"Wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles" and "matrix dissolves"**

The disputed terms are part of all asserted claims. Claim 1 is representative:

>    A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane, wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 m$^2$/mL, wherein the porous matrix is in a dry powder form, and **wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles** . . . .

>    **1.**    **"Wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles"**

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "Wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles" | Plain and ordinary meaning | This claim limitation is indefinite. To the extent this limitation can be construed, any construction should make clear that this limitation requires that, wherein upon exposure to an aqueous medium, at least any hydrophilic excipient and wetting agent must both immediately and completely dissolve to leave only taxane drug in the form of nanoparticles and microparticles that are no longer associated with either the hydrophilic excipient or the wetting agent. Further, to the extent this limitation can be construed, any construction should make clear that this claim limitation excludes from the scope of the claim controlled release, polymer encapsulated formulations that upon excposure to an aqueous medium leave a suspension of |

| | | paclitaxel and albumin in the form of nanoparticles. |
| --- | --- | --- |

a.    **Plaintiffs' proposed construction of plain and ordinary meaning is supported by the intrinsic evidence.**

This claim term means exactly what it says.  When the porous matrix is exposed to an aqueous medium, it dissolves and leaves the defined taxane particles.  This makes sense in the context of the invention as fully described in the specification.  An object of the invention is to "provide paclitaxel compositions for administration as a bolus injection" to a patient instead of by infusion over several hours (as was necessary for the paclitaxel formulation with Cremophor). (Ex. 1, '493 patent at col. 1:44-47, 1:61-63.)  However, the matrices "are porous dry powders," (*id*. at col. 3:1-3) which must be reconstituted before being administered to a person.  Therefore, the specification describes that "the [powder] porous paclitaxel matrix is reconstituted with an aqueous medium" (*id.* at col. 2:47-50) after which a "suspension of paclitaxel particles in an aqueous medium remains." (*Id.* at col. 3:51-58.)  This suspension is "administered parenterally [by injection], such as intramuscularly, subcutaneously, or intravenously." (*Id.* at col. 2:47-50; col. 9:9-16.)  The first portion of Example 3 of the '493 patent exemplifies reconstitution, forming a "suspension" of nanoparticles and microparticles  by adding 10 mL of the aqueous medium (TWEEN 80 ("T80")/PBS) to a formulation containing 5 mg of paclitaxel. (*Id.* at col. 10:22-26.)  Accordingly, a person of skill in the art would understand that the claim term is met when the paclitaxel formulation comprising the porous matrix is reconstituted in an aqueous medium and at a volume in which nanoparticles and microparticles of taxane are left in suspension.[16] (Ex. 10, 2/22/13 Langer ¶ 57.)

---

[16]For example, the Abraxane label instructs users to "reconstitute each vial [containing 100 mg of paclitaxel] by injecting 20 mL of 0.9% Sodium Chloride Injection, USP." (Ex. 31, Abraxane Label at CEPH-000168.)

Defendants contend that the term must be construed to require that "upon exposure to an aqueous medium at least any hydrophilic excipient and wetting agent in the claimed composition must both immediately and completely dissolve to leave only taxane drug that are no longer associated with either the hydrophilic excipient or the wetting agent." Yet again, Defendants' proposed construction improperly reads significant new limitations into the claim terms. *E.g.*, *Rambus*, 318 F.3d at 1088. There is no requirement in the intrinsic evidence that "at least any hydrophilic excipient and wetting agent in the claimed composition must both ***immediately*** and ***completely*** dissolve to leave only taxane drug that are no longer associated with either the hydrophilic excipient or the wetting agent." (emphasis added) (See Section IV.B.)

First, the words "immediately" and "completely" appear nowhere in the claims, specification, or prosecution history with respect to the hydrophilic excipient, wetting agent, or the matrix. Second, the specification provides clear examples of "wetting agents," which Dr. Amiji asserts are all also hydrophilic excipients, that are ***not*** water soluble (e.g., magnesium aluminum sulfate) and therefore would not dissolve. (Ex. 1, '493 patent, col. 4:61; Ex. 13, Amiji Dep. 54:10-12.) This fact alone establishes that the patent cannot be interpreted to require every type of hydrophilic excipient and/or wetting agent to dissolve completely and immediately. Third, as stated above, the specification contradicts Defendants' construction and confirms that not every excipient, *only* the water soluble excipients in the matrix will dissolve: "[u]pon contact with an aqueous medium, water penetrates through the highly porous matrix to dissolve the water soluble excipients in the matrix." (Ex. 1, '493 patent at col. 3:54-57.) Finally, even Defendants' expert states in his report that use of the term "dissolve" or "dissolution" does not require that a substance completely and immediately goes into solution. Substances begin the process of dissolving immediately but they are not necessarily dissolved completely at that

moment.  Dr. Amiji agrees that Example 3 "describes the test for measuring the dissolution of the claimed matrices."  (Ex. 24, 4/22/13 Amiji Report at ¶33.)  And, in reviewing that Example, he states that "dissolution" means the "action or process of dissolving or being dissolved."  (*Id.* at 18 n.2.)  Dr. Amiji's own definition makes clear that the matrix and the component parts which make it up do not necessarily immediately or completely become dissolved, but rather at least begin the process of dissolving when they are exposed to the aqueous medium.

Moreover, there is no limitation in the claim to the effect that "[c]ontrolled release, polymer encapsulated formulations containing paclitaxel and albumin in the form of nanoparticles or microparticles" are not covered.  This is the same argument that Defendants have made with respect to other claim terms and fails for the same reasons.  (Section IV.A.2(b).)

## b.      The claim term is sufficiently definite.

Defendants again contend that the term is indefinite, this time because it does not specify the volume of aqueous medium which must be added to the claimed composition to cause the matrix to dissolve, leaving nanoparticles and microparticles of a taxane.  (*See also id.* at col. 3:54-58.)  The claim does not require a particular volume or aqueous medium in which to form nanoparticles and microparticles, but a volume sufficient to dissolve the matrix and leave taxane nanoparticles and microparticles.  (Ex. 10, 2/22/2013 Langer ¶ 57; Ex. 12, Langer Dep. at 275:22-277:10.)  This is exemplified in Example 3, where the patent provides a procedure for reconstituting the taxane in 10mL of T80/PBS to form nanoparticles and microparticles in suspension.  (Ex. 1, '493 patent at col. 10:22-26.)  Courts have declined to find claims indefinite where the disputed claim term can be interpreted by reference to examples provided in the specification.  *See*, *e.g.*, *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366-67 (Fed. Cir. 2010) (rejecting indefiniteness where "the written description gives a clear example" demonstrating the claim term at issue); *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554

F.3d 1010, 1022 (Fed. Cir. 2009) (rejecting indefiniteness where patent specification "provide[d] several examples" demonstrating the claim term at issue). But a person of ordinary skill in the art would know that nanoparticles and microparticles may be left in suspension in other volumes and in other aqueous media, and could easily determine that for a given reconstitution medium. (*See* Ex. 12, Langer Dep. at 275:22-277:10)

Defendants cannot meet the extremely high standard required to show indefiniteness. (*See* Section III.B.)

### 2. "Matrix dissolves"

The term "matrix dissolves" is part of the larger term "wherein upon exposure to an aqueous medium, the matrix dissolves to leave taxane nanoparticles and microparticles."

| Claim Terms | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| "Matrix dissolves" | At least some amount of the water soluble excipients in the matrix dissolve | Go into solution |

Plaintiffs' construction of "matrix dissolves" as "at least some amount of the water soluble excipients in the matrix dissolve" is supported by the intrinsic evidence and tracks the language of the specification. The claims simply require that "upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles." (Ex. 1, '493 patent at cls. 1, 17.) The specification makes clear that "[u]pon contact with an aqueous medium, water penetrates through the highly porous matrix to dissolve ***the water soluble excipients*** in the matrix." (*Id.* at col. 3:54-58 (emphasis added).) Thus, the specification expressly leaves open the possibility that there will be non-water soluble excipients in the matrix that remain in suspension with the paclitaxel particles. (*Id.*) And as explained above, there is nothing in the intrinsic evidence that requires the complete dissolution of the hydrophilic excipient and wetting agent, leaving particles of only taxane drug. (Section E.1.a) Consistent

with the intrinsic evidence, the Court should construe "matrix dissolves" to mean "at least some

amount of the water soluble excipients in the matrix dissolve (i.e. go into solution)."

> F.   **"Wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" and "solution"**

The disputed claim terms appear in all asserted claims.  As the "solution" term is part of

the larger term to be construed, Plaintiffs address the terms together.  Claim 1 is representative:

> A pharmaceutical composition comprising a porous matrix formed of a hydrophilic excipient, a wetting agent and nanoparticles and microparticles of a taxane, wherein the nanoparticles and microparticles have a mean diameter between about 0.01 and 5 µm and a total surface area greater than about 0.5 $m^2$/mL, wherein the porous matrix is in a dry powder form, and wherein upon exposure to an aqueous medium, the matrix dissolves to leave the taxane nanoparticles and microparticles, **wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane.**

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| Wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane | Wherein the dissolution rate of taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane as measured according to Example 3 of the '493 patent | This claim limitation is indefinite. To the extent this limitation can be construed, any construction should make clear that this claim limitation excludes from the scope of the claims pharmaceutical formulations in which upon exposure to an aqueous medium particles of paclitaxel and albumin can remain stable in a suspension for at least 3 days at a concentration between 1.2 mg/ml – 3mg/ml. |
| solution | As used in claims 1 and 17, "solution" is T80/PBS. | A homogeneous mixture of two or more substances |

> 1.   **The intrinsic evidence supports Plaintiffs' constructions that these terms should be interpreted by reference to Example 3.**

The intrinsic evidence makes clear that Plaintiffs' proposed constructions are correct.

The claim language itself demonstrates that this term requires assessing "the dissolution rate of

the taxane nanoparticles and microparticles . . . relative to unprocessed taxane."  The way to

determine the dissolution rate of the claimed taxane nanoparticles and microparticles relative to

unprocessed taxane is set forth clearly in Example 3 of the '493 patent.  ('493 patent at col. 10:14-56.)  Patent examples are commonly used to shed light upon how a claim term should be defined.  *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1346 (Fed. Cir. 2007) ("Figure[] shows an example [of the claim term at issue] . . . and provides a standard for measuring the meaning of the term . . . ."); *Oakley Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341 (Fed. Cir. 2003) (interpreting claim term by reference to a calculation performed in "a number of the examples").

Specifically, Example 3 shows that dissolution studies were conducted for three different types of pharmaceutical compositions which fall within the claims in order to compare them to unprocessed taxane.  (Examples 1 and 2 and unprocessed bulk paclitaxel).  (*Id.* at col. 10:16-18; col. 19:47-48.)  First, each composition from the prior two Examples was separately added to 10 mL of 0.08% TWEEN® (T80/PBS) to contain 5 mg of paclitaxel, thereby forming a suspension. ('493 patent at col. 10:22-26.)  This step was repeated with unprocessed bulk paclitaxel in order to compare its dissolution rate with those of the two claimed compositions.  Second, separately, 0.25 mL of each of the resulting three suspensions (corresponding to Example 1, Example 2, and bulk paclitaxel) were added to 250 mL of T80/PBS "for dissolution analysis" to measure the amount of dissolution of the paclitaxel particles.  (*Id.* at col. 10:26-28, col. 10:36-38.)  The results are presented in Figure 1, which demonstrates a faster rate of dissolution of taxane for the claimed compositions (e.g., Examples 1 and 2) relative to unprocessed taxane (or "Bulk Paclitaxel").  (*Id.* at Ex. 3, col. 10:47-56 & Fig. 1.)  Example 3 is the only example in the patent which provides this information.  Thus, the claim term "wherein the dissolution rate of taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" would be measured according to the *in vitro* dissolution testing described in Example 3 of the '493 patent.

The prosecution history confirms that Example 3 provides the standard by which to measure the dissolution rate of the taxane nanoparticles and microparticles. During prosecution, the "wherein the dissolution rate of taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" claim term was added as an amendment to Claims 1 and 17 in response to the examiner's rejection. (Ex. 5, 8/7/2002 Amend. at CEPH-000923-24.) The Applicants informed the Examiner that Claims 1 and 17 were "amended to incorporate the limitation that the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to the unprocessed or bulk form, *as stated at* page 6, lines 3-5, *example 3, and Figure 1*." (*Id.* at CEPH-000924 (emphasis added).)

Indeed, in conjunction with this newly added limitation distinguishing the invention from the prior art, the Applicants requested that the Examiner's "attention [be] drawn to example 3 of the application," which demonstrates that some of the claimed compositions "yields taxane that dissolves at a rate that may be 1000 times shorter than for bulk taxane." (*Id.* at CEPH-000927.) Thus, the Applicants expressly referred the Examiner to Example 3 and the results associated with the testing in Figure 1, to interpret the new claim limitation. The case law establishes that where, as here, the prosecution history shows that the inventors explained the meaning of a term by reference to examples and figures in a patent, those examples and figures should be used to construe the term. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1373 (Fed. Cir. 2003) (construing a patent in accordance with "Figure 2 . . . , to which 3M directed the examiner"); *Icon Outdoors, LLC v. Core Res., Inc.*, No. 11-2967, 2012 WL 5521121, at *7-8 (D. Md. Nov. 14, 2012) (interpreting a claim term in accordance with drawings in the patent because the prosecution history showed that the inventors overcame the examiner's rejection by explaining that the term was intended to be understood as it was shown in the drawings); *Teva*

*Pharms. USA, Inc. v. Sandoz Inc.*, 810 F. Supp. 2d 578, 591-92 (S.D.N.Y. 2011) (interpreting a claim term based on a figure in the patent because a prosecution statement referring to that figure was "the only statement that defined [the term] directly").

Plaintiffs' construction of the claim term "solution" as T80/PBS is consistent with Example 3 being the standard for measuring the dissolution of the nanoparticles and microparticles of taxane. As discussed above, the term "solution" was added to the claim and is illustrated by reference to Example 3. In Example 3, the "aqueous solution" is the T80/PBS solution, (Ex. 1, '493 patent at col. 10:22-28, 10:37), in which the "in vitro dissolution rates" of the compositions of the invention are measured relative to "the dissolution rate[] of the non-formulated paclitaxel." (*Id.* at col. 10:16-18.)

Defendants' proposed construction of the term "solution" using the general definition of "a homogeneous mixture of two or more substances" ignores the intrinsic evidence in the specification and prosecution history that provides context for this claim term.

        **2.**     **The claim term "wherein the dissolution rate of the taxane nanoparticles and microparticles in an aqueous solution is increased relative to unprocessed taxane" is sufficiently definite.**

Defendants contend that the term is indefinite. But the Applicants included a specific example, Example 3, to provide guidance as to how to measure the dissolution rates of the claimed compositions relative to unprocessed taxane, and courts have declined to find claims indefinite where the disputed claim term can be interpreted according to examples provided in the specification. *Hearing Components*, 600 F.3d at 1366-67; *Kinetic Concepts,* 554 F.3d at 1022. Moreover, during the prosecution of the reissue application resulting in the '493 patent, the Examiner expressly considered whether this claim term was indefinite, (Ex. 32, 11/29/2006 Office Action at CEPH-001381; Ex. 33, 3/5/2007 Amendment at CEPH-001453-54), and found that it was not, (Ex. 34, 4/12/2007 Office Action at CEPH-001479), raising a "heavy

presumption" against Defendants' argument.   *See Teva Pharms*, 810 F. Supp. 2d at 590 ("[W]here a patent examiner has specifically raised an indefiniteness objection and the issue has been resolved to the patent examiner's satisfaction, there is a heavy presumption against a party arguing that the patents" are indefinite.) (internal quotation omitted).

Defendants cannot meet the "exacting standard" to establish that a claim term is indefinite.  *Wellman*, 642 F.3d at 1366.

## V.    CONCLUSION

For the foregoing reasons, Cephalon and Acusphere respectfully request that this Court adopt their proposed claim constructions and reject Celgene's and Abraxis' proposals.

Respectfully submitted,

CEPHALON, INC. and ACUSPHERE, INC.

/s/ Nicholas K. Mitrokostas
John T. Bennett (BBO #648464)
Nicholas K. Mitrokostas (BBO #657974)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel: (617) 570-1000
Fax: (617) 523-1231
jbennett@goodwinprocter.com
nmitrokostas@goodwinprocter.com

George C. Lombardi (*pro hac vice*)
Christopher B. Essig (*pro hac vice*)
Julia M. Johnson (*pro hac vice*)
John R. McNair (*pro hac vice*)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, IL 60601
Tel: (312) 558-5600
Fax: (312) 558-5700
glombardi@winston.com
cessig@winston.com
jmjohnson@winston.com
jmcnair@winston.com
*Attorneys for Plaintiffs/Counterclaim-Defendants*

Dated: April 26, 2013

## <u>CERTIFICATE OF SERVICE</u>

      I, Nicholas K. Mitrokostas, hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on  April 26, 2013.

<u>/s/ Nicholas K. Mitrokostas</u>